UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MAKESHA JIMMESON,
                    Plaintiff,

        v.

NANCY A. BERRYHILL,[1] Acting
Commissioner of Social Security,
                    Defendant.

_____

**DECISION & ORDER**
16-CV-6058

### Preliminary Statement

Plaintiff Makesha Jimmeson ("plaintiff" or "Jimmeson") brings this action pursuant to Title XVI of the Social Security Act seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits. See Complaint (Docket # 1). Presently before the Court are competing motions for judgment on the pleadings. See Docket ## 13, 19. For the reasons that follow, plaintiff's motion for judgment on the pleadings (Docket # 13) is **granted** and the Commissioner's motion for judgment on the pleadings (Docket # 19) is **denied**.

### Background and Procedural History

Plaintiff filed an application for supplemental security income on June 18, 2012, with an alleged onset date of March 4,

_____

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 20, 2017. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for former Acting Commissioner Carolyn W. Colvin as defendant in this lawsuit.

1

2010.  Administrative Record, Docket # 8 ("AR"), at 161.  She alleged that she suffered the following illnesses, injuries, or conditions: anxiety, depression, bipolar, high blood pressure, and broken ankle.  AR at 89.  Her claims were initially denied on September 13, 2012.  AR at 100-102.  On October 11, 2012, plaintiff filed a written request for a hearing.  AR at 112. Plaintiff, who was represented by an attorney, testified at a hearing on March 19, 2014, before Administrative Law Judge Connor O'Brien (the "ALJ").  AR at 26-88.  Vocational Expert Carol G. McManus (the "VE") also testified.  On July 17, 2014, the ALJ issued an unfavorable decision.  AR at 12-21.  Plaintiff requested that the Appeals Council review the ALJ's decision, which review the Appeals Council denied on December 7, 2015.  AR at 1-3.

Plaintiff filed her complaint on February 2, 2016 (see Docket # 1), and her motion for judgment on the pleadings on August 29, 2016 (see Docket # 13).  The Commissioner filed a cross-motion for judgment on the pleadings on November 28, 2016 (see Docket # 19).  This Court heard oral argument on February 13, 2017 (see Docket # 24).

## Relevant Medical History[2]

Mental Health Treatment Records:  Plaintiff has an extensive history of mental illness replete with references to

---

[2] Plaintiff's physical impairments are not at issue here.

2

violent ideations, impulse control problems, and bipolar disorder. Plaintiff's hostile affect was noted in the record as early as October 27, 2010. AR at 356. On May 23, 2011, plaintiff told Physician's Assistant Sandra Williams that she had "never [been] told she has bipolar." AR at 412. Nevertheless, on September 22, 2011, plaintiff presented to Dr. Prakash Reddy[3] with violent ideations and stated that she "ha[d] always struggled with anger." Dr. Reddy diagnosed plaintiff with bipolar disorder and impulse control disorder. AR at 307-308, 313.

Plaintiff's bipolar disorder — and its effects on her mental health — are also referenced by multiple therapists in repeated treatment notes. AR at 430, 732, 774, 779, 784. On several occasions, her bipolar disorder was listed as under sub-optimal control. AR at 772; AR at 793; AR at 799.

Plaintiff's violent thoughts and inability to control her impulses are also well-documented in the record. See AR at 431 (plaintiff stated she had no desire to harm anyone, but would do so if she became angry); AR at 503 (Therapist Rebecca Boone noted plaintiff's history of violence and impulsivity but

---

[3] Prior to hearing this case the Court disclosed to both counsel that Dr. Reddy is a next-door neighbor of the Court. Aside from an occasional greeting, the Court has no social or other interaction with Dr. Reddy and the parties consented to the Court hearing and determining the competing motions for judgment on the pleadings.

assessed her as a low risk for violence); AR at 511 (Therapist Boone documented plaintiff's "willingness to protect herself in self defense but actively avoid situations in which she may become triggered for violence."). For example, on September 17, 2013, plaintiff reported that she had wanted to hurt someone since her son's murder. AR at 568. However, she appreciated the moral and legal implications of any such action and advised that she did not have any intention of hurting anyone. AR at 570-71.

Similarly, on July 5, 2013, Dr. Bolduc saw plaintiff, who was aggressive and hostile. She denied being previously seen by Dr. Bolduc, who advised her that a urine screen was negative for the opiates she had been prescribed, leading Dr. Bolduc to opine that plaintiff was misusing the opiates. AR at 788. Plaintiff became agitated at the suggestion that she was not taking her prescribed drugs and stated that she was going to get a new doctor. The entire incident happened in front of her young son. AR at 788. She again appeared enraged when she reported to Unity Health System on November 22, 2013, for a pregnancy test. She waited for over two hours and when she was seen by a student, she became irate and cursed at the doctor and his student. AR at 600.

Plaintiff's therapy sessions with Kelly Murrell at the Catholic Family Center between May and July, 2014 also shed

4

light on the scope of her mental impairments. AR at 834; AR at 851-74. She began therapy because her son had recently been murdered. Throughout the sessions, she noted that she had a history of being violent and had an inability to control her emotions and was diagnosed with bipolar disorder and depression. Therapist Murrell assigned her a GAF of 50. AR at 848. Plaintiff reported not liking to be around other people. And she had difficulty sleeping and concentrating and a poor appetite. AR at 851. Plaintiff reported hitting her seven-year-old son with a belt. AR at 853. She also reported frustration with her medical providers who she believed were expecting too much from her. AR at 855.

On May 21, 2014, plaintiff was angry and reported to Therapist Murrell that she was trying to confront two women who had been harassing her son. She identified homicidal ideation. AR at 857. But the following week, plaintiff was calm and pleasant and reported that there were no further issues with harassment. On June 13, 2014, plaintiff reported that her nephew came to visit her and stated that he had information about her son's death but would not divulge the details. Plaintiff got angry and wanted to kill her nephew but family members intervened. AR at 865. On July 22, 2014, plaintiff again reported feeling angry, this time due to a not-guilty verdict in her son's murder case. This prompted her to become

excessively involved in sexual behaviors (intercourse, pornography) because it gave her a "rush." AR at 868. Plaintiff acknowledged that she engages in impulsive and reckless behavior when feeling stressed. AR at 868.

There are several references in the record to instances in which plaintiff discontinued or failed to appear for treatment. For example, in the spring of 2012, plaintiff failed to appear several times for scheduled therapy. See AR at 340-341. Shortly thereafter, plaintiff presented to outpatient mental health treatment due to self-reported depression and mood lability. Therapist Kelly worked to manage plaintiff's feelings of anger in an effort to decrease violent behavior. AR at 323. However, plaintiff told her physician, Dr. Donahue, that she did not believe her needs were being met. AR at 371. She was discharged on July 25, 2012 per her own request, because she did not believe treatment was helpful. AR at 323, 339. On August 8, 2012, plaintiff reported to Unity Family Medicine at St. Mary's where she stated that she was unable to reach her therapist, a contention which conflicts with reports from the therapist that she was unable to reach plaintiff. AR at 732. On December 17, 2013, Therapist Boone noted that plaintiff's attendance at treatment had been inconsistent. AR at 514.

Medical Evaluations: On November 23, 2010, plaintiff's counselor at Unity Behavioral Mental Health completed a

6

psychological assessment. The evaluator stated that plaintiff interacted with violence towards others on occasion, and that her behavior occasionally interfered with her life. AR at 517. The therapist assigned a GAF of 57. She opined that plaintiff was moderately limited (unable to function 10-25% of the time) in the capacity to follow instructions and directions, ability to maintain attention, attend to a regular routine, and perform simple tasks. She opined that plaintiff was very limited (unable to function 25% or more of the time) in her ability to perform tasks independently. AR at 518.

Counselor Kristin M. Kelly completed a psychological evaluation on June 28, 2011, opining that plaintiff was very limited in capacity to follow instructions and ability to perform low stress and simple jobs. She listed plaintiff as moderately limited in all other respects and noted that these limitations were expected to last for three months. AR at 522. Several months later, on December 30, 2011, Counselor Kelly reiterated her previous opinion, but added that plaintiff would be very limited in the capacity to perform simple and complex tasks independently and the capacity to maintain attention and concentration. AR at 526.

Kavitha Finnity, Ph.D., performed a psychiatric evaluation on plaintiff on September 10, 2012. During that evaluation, plaintiff reported that she had difficulty sleeping, loss of

7

energy, social withdrawal, restlessness, anxiety, racing thoughts, and a low appetite. AR at 478. She stated that she had one to two panic attacks per day and felt depressed and appeared anxious. AR at 478. However, plaintiff's thought process appeared coherent and her attention and concentration were intact. AR at 479. Plaintiff's recent and remote memory skills were mildly impaired. AR at 479. Dr. Finnity evaluated plaintiff's insight and judgment as fair. AR at 480. Dr. Finnity opined that plaintiff could follow and understand simple directions and perform simple tasks and could maintain attention and concentration. AR at 480. Dr. Finnity further opined that plaintiff "is unable to maintain a regular schedule" and is "unable to relate to others or appropriately deal with stress." AR at 480. However, plaintiff could learn new tasks, perform complex tasks with supervision, and "can make appropriate decisions." AR at 480. Dr. Finnity diagnosed plaintiff with major depressive disorder and panic disorder and listed her prognosis as fair. AR at 480.

On October 23, 2012, Deanna Ferguson, MHC, completed another psychological evaluation form, opining that plaintiff was very limited in capacity to regularly attend to a routine, but was moderately limited in following simple instructions, performing simple and complex tasks independently, maintaining attention, and in performing low stress and simple tasks. AR at

8

531. Counselor Ferguson expected these symptoms to last three
months. AR at 531.

On May 27, 2014, Kelly Murrell, LMSW, diagnosed plaintiff
with bipolar disorder and a GAF of 50. AR at 809. She opined
that plaintiff was very limited (unable to function 25% of the
time) in the capacity to follow instructions, the capacity to
perform simple and complex tasks independently, the capacity to
maintain attention, the capacity to regularly attend to a
routine, and the capacity to perform low stress and simple
tasks. AR at 809. She expected that plaintiff could not
participate in any activities aside from treatment for six
months. AR at 810.

Hearing Testimony: At the hearing, the ALJ questioned
plaintiff about her bipolar diagnosis. Specifically, the ALJ
asked, "how do you know you have that? What symptoms do you
have?" AR at 59. Plaintiff responded that she gets upset and
frustrated, and when the ALJ noted that everyone gets
frustrated, plaintiff said that "it gets really bad." AR at 60.
She swears and gets loud, and it is difficult for her to calm
down. Plaintiff reported that she had been previously arrested
for assault. AR at 60. On one occasion, she intervened in a
fight on behalf of her nieces. She also had several on-the-job
misunderstandings that resulted in physical altercations. AR at

9

61.  Plaintiff has been working to avoid situations in which she could get into a conflict.  AR at 38.

Plaintiff also reported attending physical therapy, but that she had stopped going because it was "just overwhelming." AR at 56.  She reported being very frustrated the past few years because she wants to work but is unable to do so and always ends up in pain.  AR at 57.

### Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited.  It is not the function of the Court to determine *de novo* whether plaintiff is disabled.  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012).  Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed.  Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir. 2007).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Brault, 683 F.3d at 447—48 (internal citation and quotation marks omitted).  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must

10

be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotations omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722

11

F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff's arguments are twofold. First, she argues that the ALJ failed to include plaintiff's bipolar disorder and impulse control disorder as severe impairments at Step Two of the evaluation process. Plaintiff argues that this omission is not harmless because the ALJ repeatedly referenced plaintiff's non-compliance with treatment in her RFC without addressing whether such non-compliance could be caused by plaintiff's bipolar or impulse control disorders. Second, plaintiff argues that the ALJ mischaracterized Dr. Finnity's consultative examination report, which resulted in a finding not supported by substantial evidence. I address each argument below.

I. Failure to Evaluate Plaintiff's Bipolar Disorder and Impulse Control at Step Two: Plaintiff's first argument is that the ALJ failed to classify plaintiff's bipolar disorder and impulse control disorder as severe impairments under 20 C.F.R. §

12

416.920(c). These impairments, plaintiff argues, are medically determinable, severe, and separate from affective disorder, anxiety disorder, and anti-social personality disorder, the severe impairments the ALJ found at Step Two. Plaintiff also argues that her impulse control disorder and bipolar disorder could account for her non-compliance with treatment, which the ALJ repeatedly referenced in formulating her RFC.

I agree that the ALJ should have included plaintiff's bipolar and impulse control disorder at Step Two. The Commissioner must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, will be of sufficient severity" to warrant benefits. 20 C.F.R. § 404.1523; see 20 C.F.R. § 416.923. Impairments are considered severe when they significantly limit a plaintiff's "ability to conduct basic work activities." 20 C.F.R. § 404.1520(c); see 20 C.F.R. § 416.920(c). Although plaintiff bears the burden of proof at Step Two, it is not a heavy burden. The Second Circuit has long held that "the standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014) (citing Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995)). Where a claimant produces some evidence of an impairment, the Commissioner may make a

13

determination of non-disability at Step Two only when the medical evidence "establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." See Program Policy Statement, SSR 85-28, 1985 WL 56856, at *3 (1985).

Plaintiff's bipolar and impulse control disorder easily meet this *de minimis* standard. The treatment record is replete with references to plaintiff's inability to control her impulses, her proclivity for lashing out in anger, and her bipolar tendencies. See AR at 360, 356, 313, 323, 430, 568, 498, 503, 509, 848; see also AR at 851-874. In addition, several medical providers diagnosed plaintiff with bipolar disorder or referenced her bipolar disorder. For example, Dr. Donahue, plaintiff's primary care physician, noted that plaintiff's "bipolar 1 disorder" was under "[s]ub-optimal control." AR at 732, 772. Dr. Reddy and Dr. Bolduc both explicitly diagnosed plaintiff with bipolar disorder and repeatedly referenced her struggles with impulse control disorder. AR at 313, 799. Plaintiff even had an outburst during a checkup with Dr. Bolduc (AR at 788) and while waiting for a pregnancy screen (AR at 600). Because there is substantial evidence that plaintiff suffers from bipolar

14

disorder and impulse control disorder, the ALJ should have included those impairments at Step Two.

Contrary to the Commissioner's assertions, this error was not harmless. While the ALJ vaguely referenced plaintiff's impulse control and bipolar problems in the evaluation process, the ALJ did not meaningfully incorporate their medical manifestations into her RFC. Specifically, the ALJ repeatedly drew negative inferences from plaintiff's struggles with treatment compliance (AR at 17-20), but did not distinctly consider whether such difficulties could be a manifestation of plaintiff's bipolar or impulse control disorders. Federal courts have recognized that failure to comply with treatment can be a direct result of bipolar disorder. See Kangail v. Barnhart, 454 F.3d 627, 630-31 (7th Cir. 2006) (bipolar disorder may prevent the sufferer from taking her prescribed medications or otherwise submitting to treatment); Sunwall v. Colvin, 158 F. Supp. 3d 1077, 1082 (D. Or. 2016) (bipolar "disease itself impaired Plaintiff's ability to comply with the medication regime"); McDonough v. Commissioner of Social Security, No. 15-cv-11918, 2016 WL 8115404, at *6 (E.D. Mich. Aug. 18, 2016) ("Courts in this district and others have ruled that plaintiffs suffering from mental impairments, particularly bipolar disorder, should not be penalized for failure to seek psychiatric treatment or non-compliance with prescription

15

medication."); Reals v. Astrue, No. 08-3063, 2010 WL 654337 at #2 (W.D. Ark. Feb. 19, 2010) ("According to the DSM, patients suffering from . . . bipolar disorder also suffer from anosognosia, or poor insight. . . . predispose[ing] the individual to noncompliance with treatment."); Frankhauser v. Barnhart, 403 F. Supp. 2d 261, 277 (W.D.N.Y. 2005) (Since non-compliance with treatment is "part of the disease process" for individuals suffering from bipolar disorder, failure to follow through with treatment does not require finding of not disabled). And, federal courts in this district have acknowledged more broadly that failure to comply with treatment may be a result of mental illness. See Johnson v. Colvin, No. 1:14-CV-00353 (MAT), 2016 WL 624921, at *2, n.1 (W.D.N.Y. Feb. 17, 2016)) ("[r]ather than indicating a lack of serious mental impairment, plaintiff's noncompliance [with treatment] was very possibly a further indicator that her mental health impairments interfered with her functioning").

The ALJ's failure to include plaintiff's bipolar disorder and impulse control disorder as severe impairments at Step Two was not harmless because these mental health disorders could have impacted or accounted for plaintiff's failure or inability to comply with treatment recommendations. Indeed, according to the ALJ, the RFC she assigned to plaintiff was based, *inter alia*, "on the plaintiff's response to treatment when compliant."

AR at 20 (emphasis supplied).   If compliance with treatment is used to justify an assigned RFC, it is incumbent upon the ALJ to identify what mental health impairments plaintiff suffers from and then fully consider whether a manifestation of the mental health impairment is non-compliance with recommended treatment.

II. ALJ's Treatment of Consultative Examiner Dr. Finnity's Opinion:   Plaintiff also quarrels with the ALJ's treatment of Dr. Finnity's consultative examination.   Dr. Finnity opined that plaintiff was "unable to maintain a regular schedule" (AR at 480) and "unable to relate to others or appropriately deal with stress" (AR at 480).   Plaintiff says that the ALJ committed error by casting the opinion as merely "restrict[ions] in her ability to relate with others, appropriately deal with stress, or maintain a regular schedule" while "retain[ing] the ability to perform simple tasks, maintain attention and concentration, learn new tasks, and perform complex tasks under supervision." AR at 19.   This, plaintiff says, inappropriately dilutes Dr. Finnity's assessment as merely a limitation on plaintiff's abilities rather than an outright inability to engage in those activities.

I agree.   Dr. Finnity's opinion with respect to plaintiff's ability to (1) maintain a regular schedule; (2) adequately relate to others and (3) appropriately deal with stress was clear and unequivocal.   After conducting an independent

17

psychiatric evaluation, Dr. Finnity found plaintiff was <u>unable</u> to do any of these work related-tasks.   Other evidence in the record, such as the opinions of Counselor Kelly (AR at 522-26) and Counselor Ferguson (AR at 531) and plaintiff's own testimony regarding her anger and impulse issues, support Dr. Finnity's opinion.

The ALJ gave Dr. Finnity's opinion only "some weight". According to the ALJ, although Dr. Finnity's "assessment is based on [a personal] examination" and Dr. Finnity "is familiar with the agency's considerations," the "record supports some <u>additional limitations</u> which are provided in the residual functional capacity." AR at 19 (emphasis added).   This finding is problematic and needs to be addressed on remand.   The ALJ's treatment of Dr. Finnity's evaluation is confusing because despite stating that the record supports <u>additional</u> limitations beyond what Dr. Finnity recommended, the ALJ found that plaintiff could engage in a much broader set of activities than Dr. Finnity's opinion would allow.   In other words, the ALJ did not completely credit Dr. Finnity's findings because the record supported <u>more</u> restrictive limitations, but then formulated an RFC that not only ignored many of Dr. Finnity's restrictions but was ultimately <u>less</u> restrictive than Dr. Finnity found appropriate.   For example, Dr. Finnity's opinion states that plaintiff could not interact <u>at all</u> with others.   The RFC,

18

however, indicates that plaintiff could not interact with the public but could occasionally interact with co-workers. Similarly, Dr. Finnity's opinion that plaintiff could not maintain a regular schedule and could not appropriately deal with stress belies the ALJ's determination that plaintiff could function in a competitive employment environment. Accordingly, I find that the ALJ's consideration of Dr. Finnity's opinion in formulating an RFC was not adequately explained and should be addressed on remand.

## Conclusion

For the foregoing reasons, the plaintiff's motion (Docket # 13) is **granted**, and the defendant's motion (Docket # 19) is **denied**. This case is remanded for further proceedings consistent with this order.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:    March 20, 2017
          Rochester, New York